670 A.2d 1165

**PENNSYLVANIA ELECTRIC COMPANY, Appellant,**

**v.**

**Vernon F. WALTMAN, Appellee.**

Superior Court of Pennsylvania.

Argued May 18, 1995.

Decided Sept. 11, 1995.

Reargument Denied Nov. 17, 1995.

Anthony J. Basinski, Pittsburgh, for appellant.

William E. Hager, III, New Bethlehem, for appellee.

Before POPOVICH, HUDOCK and OLSZEWSKI, JJ.

POPOVICH, Judge:

Pennsylvania Electric Company ("Penelec") appeals from the judgment entered in the Court of Common Pleas of Clarion County following a bench trial in a boundary dispute. After careful review, we affirm.

The factual background of this dispute revolves around ownership to a strip of approximately ten acres of land abutting the Clarion River. Penelec, an electric utility company, operates a hydroelectric plant on the Clarion River. This plant was constructed by Penelec's predecessor as part of the Piney Dam Project. Construction of the plant required approval by the Federal Power Commission, and an alleged prerequisite to this approval was that the utility acquire all property along a particular stretch of the Clarion River to an elevation of 1105 feet. The dispute arose as a result of certain structures that appellee, Vernon Waltman, constructed on what he believed was his property. Penelec contended that the structures were on its property because the land was allegedly for the dam construction project.

The parties trace their titles to one J.P. Maxwell. Penelec's title originated in an August, 1922, option that Maxwell granted to County Realty Company ("County Realty") for a section of a tract of his property situated below the 1105 foot elevation. Specifically, the option provided: "On the west by land of James Campbell heirs; being that part of my lands lying below said elevation 1105 feet above sea level; containing 10 acres more or less ..." The option was accepted by County Realty in November of 1922.[1]

Maxwell conveyed the property to County Realty by deed in December of 1922. County Realty subsequently conveyed the tract to the Clarion River Power Company followed by a conveyance of the same tract to Penelec by deed in March of 1942.[2] This deed made no mention of conveying all land below

1. The option included the following description of the property:
   On the north by that part of our lands lying above elevation 1105 feet above sea level; said elevation being determined from a bench mark established by the United States Geological Survey;
   On the west by lands of James Campbell Heirs; being that part of my lands lying below said elevation 1105 feet above sea level; containing 10 acres more, or less ...

2. The deed specifically contained the following course descriptions:
   [T]hence with the line of other lands of J.P. Maxwell for the following fourteen Courses:
   (1) North 30 degrees − 19′ East 184.6 feet

the 1105 foot elevation. Instead the description of the property conveyed was done by courses and distances.

Waltman's title originated in a 1978 deed from Maxwell's widow to one Jack Baum. This deed conveyed the remaining property in the Maxwell tract and contained an express exception for the property that was conveyed to County Realty. In 1984, Baum conveyed, by deed, a tract of approximately 15 acres to Waltman. This deed stated that the conveyance was subject to the property deeded to Penelec.

Upon taking possession of his property, Waltman constructed a concrete boat dock, a house and several other improvements below the 1105 foot elevation. Penelec became aware of these improvements in 1986, and asked Waltman to remove them. When this request was refused, Penelec brought an action for injunctive relief requesting the removal of these structures.[3]

The boundary dispute centers around the deed from the Maxwell's to County Realty ("County Realty deed"). Penelec alleges this deed is ambiguous. The ambiguity supposedly arises because the deed was missing two distance calls and the deed description did not close.[4] At trial, Penelec presented

(2) North 33 degrees – 04' East 232.2 feet
(3) North 35 degrees – 03' East 262.2 feet
(4) North 13 degrees – 50' East 149.2 feet,
(5) South 57 degrees – 56' East 61.0 feet,
(6) North 70 degrees – 29' East 156.9 feet,
(7) North 65 degrees – 00' East 243.9 feet,
(8) North 63 degrees – 04' East 334.5 feet
(9) North 71 degrees – 24' East 190.1 feet.,
(10) North 76 degrees – 40' East 238.7 feet,
(11) North 82 degrees – 00' East 218.1 feet,
(12) South 88 degrees 42' East 285.3 feet,
(13) South 85 degrees 40' East 293.9 feet,
(14) South 79 degrees 53' East 219.2 feet to a post and stones, a corner to other lands of J.P. Maxwell . . .

3. This action was commenced in equity by motion for preliminary injunction. However, as it was a boundary dispute, and counsel did not object, the court entered its verdict as a boundary dispute in law without transferring the case from Equity to Law.

4. Penelec contended that the following descriptions in the deed created ambiguity:

the testimony of surveyor Gregg Facciani, who provided support for Penelec's contention that the deed was ambiguous. Mr. Facciani based his opinion upon a survey he performed using a U.S. Geological Survey topographical map. He used this map because Penelec wanted to have its property tied into the 1105 foot elevation and a "stated plan coordinate system." [5] Penelec believed that it should be able to introduce extrinsic evidence to clarify the descriptions in the deed because of these alleged ambiguities.

Waltman, on the other hand, contended that the Maxwell to County Realty deed was unambiguous. Harold Frank Scott testified as a surveying expert for Waltman. Mr. Scott was familiar with the property because of a 1978 lot development survey he had prepared on the Maxwell tract. He stated that it was possible to calculate the courses and distances in the deed even though some of these were now underwater. Waltman's structures were on his own property according to Mr. Scott. Mr. Ron Scott also presented expert testimony for Waltman and stated that he established the missing corner of the deed using information from adjoining deeds. Mr. Scott further testified that Penelec was mistaken as to its property line and that he was able to establish Penelec's property using the course and distance calls in the County Realty Deed.

William McGarvey, a surveyor, also testified for Waltman and stated that the description in the deed provided sufficient information to ascertain the exact property conveyed to Penelec. McGarvey also opined that, as a result of his various surveys and computer simulations, Waltman's improvements

... Beginning at a point at low water mark on the Clarion River, opposite a stone on the right bank (looking downstream) of the Clarion River, said stone being located about 1600 feet upstream from the mouth of Calico and being a corner to the lands of M.M. Kaufman and Mrs. James Braden; thence 3 degrees—50' East to a stone; ... thence south 4 degrees 43' west to low water mark on the Clarion River ...

5. The "stated plan coordinate system" is a system on which the entire Commonwealth is based. This system establishes monuments from the United States Geological Survey and apparently can be used to tie in deed calls to establish property lines. It does not establish deed bearings.

did not encroach upon Penelec's property. Further testimony provided that it was possible to calculate, with mathematical certainty, where the property in the County Realty deed was located.

The Honorable Paul Greiner heard this evidence at a trial in May of 1994, and subsequently entered judgment on an August 16, 1994, verdict in favor of Waltman. The verdict stated that Penelec did not meet its burden of proving the boundary line in dispute to be at an elevation of 1105 feet. Judge Greiner also adopted Waltman's proposed findings of fact and conclusions of law.[6] This timely appeal followed.

Penelec now presents the following questions for review:

Did the lower court err as a matter of law in disregarding extrinsic evidence to determine the intent of the grantor in conveying property by deed to Penelec's predecessor in title?

Did the lower court err as a matter of law in determining that Waltman owned the property lying below the 1105 elevation where the undisputed evidence was that the conveyance to Waltman's predecessor in title expressly excepted all land lying below the 1105 elevation?

In the alternative, if the deed to Penelec's predecessor in title is not ambiguous, did the lower court err as a matter of law in disregarding the prevailing natural monuments and adjoining calls in determining the boundary line of Penelec's property?

In the alternative, did the lower court err as a matter of law in failing to find that Penelec owned the disputed property by *de facto* taking?

Penelec, in its first argument, contends that the lower court improperly refused to consider extrinsic evidence to aid in interpreting the ambiguities in the Maxwell to County Realty deed.

6. This entry of judgment was also based upon a November 17, 1994, order denying Penelec's post-trial motion.

The court determines whether a written instrument is ambiguous. *Metzger v. Clifford Realty Corp.*, 327 Pa.Super. 377, 476 A.2d 1 (1984). We stated in *Wysinski v. Mazzotta,* 325 Pa.Super. 128, 472 A.2d 680 (1984):

In the absence of fraud, accident or mistake, the nature and quantity of the real estate interest conveyed must be ascertained from the deed itself and cannot be shown by parol. *Covert Appeal,* 409 Pa. 290, 295, 186 A.2d 20, 23 (1962); *Highland v. Commonwealth,* 400 Pa. 261, 283, 161 A.2d 390, 402 (1960), *cert. denied,* 364 U.S. 630, 81 S.Ct. 357, 5 L.Ed.2d 363 (1961); *Johns v. Castellucci,* 264 Pa.Super. 591, 596, 401 A.2d 753, 755 (1979). When the language of the deed is clear and free from ambiguity, the intent of the parties must be determined from the language of the deed. *Teacher v. Kijurina,* 365 Pa. 480, 486, 76 A.2d 197, 200 (1950); *Detwiler v. Coldren,* 311 Pa. 44, 49, 166 A. 374, 375 (1933); *South Connellsville Borough, Inc.,* 47 Pa.Super. 350, 365 (1911). With respect to unambiguous deeds, a court must ascertain what is the meaning of the words used, not what may have been intended by the parties as shown by parol. *Covert Appeal, supra* 409 Pa. at 295, 186 A.2d at 23; *Highland v. Commonwealth, supra,* 400 Pa. at 283, 161 A.2d at 402; *Kimmel v. Svonavec,* 369 Pa. 292, 295, 85 A.2d 146, 148 (1952); *Johns v. Castellucci, supra* 264 Pa.Super. at 596, 401 A.2d at 755. To permit a variation of a deed description which is complete and unambiguous on its face, there must be evidence of a mutual mistake which is clear, precise and convincing. *Central Transportation, Inc v. Board of Assessment Appeals,* 490 Pa. 486, 494, 417 A.2d 144, 147–148 (1980); *In re Estate of Kostelnik,* 471 Pa. 94, 99, 369 A.2d 1211, 1213 (1977).

*Wysinski,* 472 A.2d at 682–683.

However, the boundaries to property are not always clear from the plain reading of a written deed. *Doman v. Brogan,* 405 Pa.Super. 254, 592 A.2d 104 (1991) (citations omitted). Where a deed is uncertain because of vague or ambiguous language, extrinsic evidence may be used to explain, but not vary, the writing in the deed. *Id.* at 109 (citation omitted).

"[T]he primary function of a court faced with a boundary dispute is to ascertain and effectuate the intentions of the parties at the time of the original subdivision." *Id.*

■ Here, we find that the lower court did not err in finding that the deed was free from ambiguity and refusing to consider extrinsic evidence. Waltman presented three surveying experts, Mr. Frank Scott, Mr. Ronald Fox and Mr. William McGarvey. Mr. Scott prepared a survey for Waltman's predecessor in title, Mr. Jack Baum, of the original J.P. Maxwell tract. The northern and eastern boundaries of this tract were established by Mr. Scott by the use of certain physical evidence. Mr. Scott also stated that courses and distances could be established even though they were under water.

Surveying expert, Mr. Fox added support to Mr. Scott's testimony with his testimony that lost corners or lost points in a deed could be reestablished. The corner in this dispute could be re-established using deed information from deeds of adjoining properties. Mr. Fox further stated that he found the northern boundary and that the Penelec line of monuments were further away from the water's edge than the Penelec deed stated. Evidence also was presented that the Penelec line was not meant to be at an elevation of 1105 feet.

Finally, Mr. McGarvey testified that modern computer simulation could establish the acreage of a tract within an inch. He further stated that he was able to establish the Maxwell to County Realty tract of land accurately by using the courses and distances in the deed and by using deeds for surrounding conveyances. In fact, Mr. McGarvey determined that Penelec was claiming ownership of approximately twenty-four acres which contradicted the ten and one-half acres that the Maxwell to County Realty deed conveyed. Finally, review of the condemnation proceedings for the Piney Dam Project reveals that land was not condemned at an 1105 foot elevation. Instead, it was condemned using course and distance descriptions.

Penelec, through its expert Gregory Facciani, did not prove that it owned the disputed property. Mr. Facciani, stated that he used a United Stated Geological Survey and attempted to tie in Penelec's property line with this survey. Mr. Facciani admitted that the courses and distances in this map did not close and contained no reference to the 1105 foot elevation. Moreover, he ran his survey at an 1105 foot elevation because Penelec believed that its property line was at this elevation. In essence, Mr. Facciani appears to have established that Penelec owned at the 1105 foot elevation by assuming that its property line was at that elevation. The trial court, in its November 17, 1994, order stated, "[Gregory] Facciani's testimony did not support Plaintiff's burden of proving it's [sic] claim by the fair weight or preponderance of the evidence." Our review of the record leads us to conclude that Judge Greiner did not err in his conclusions.

■ Penelec also argues that the deed is ambiguous because it differs from the option agreement. This argument fails in light of the doctrine of merger by deed which provides "as a general rule an agreement of sale merges into the deed and no recovery may be had based upon an earlier agreement." *Valvano v. Galardi*, 363 Pa.Super. 584, 592, 526 A.2d 1216, 1220 n. 2 (1987), *citing Stoever v. Gowen*, 280 Pa. 424, 124 A. 684 (1924); *See also*, *Doman v. Brogan, supra.* Accordingly, Penelec's first allegation of error fails.

Second, Penelec contends that the lower court erred as a matter of law in determining that Waltman owned the property lying below the 1105 elevation where the undisputed evidence was that the conveyance to Waltman's predecessor in title expressly excepted all land lying below the 1105 foot elevation.

■ When anything is excepted from a deed all things that are dependent upon it and necessary for obtaining it are also excepted. *Walker v. Forcey*, 396 Pa. 80, 151 A.2d 601 (1959). Where a doubtful reservation or exception exists in a deed, the deed will be construed most strongly in favor of the grantee. *Heidt v. Aughenbaugh Coal Company*, 406 Pa. 188,

176 A.2d 400 (1962), *citing Bundy v. Myers,* 372 Pa. 583, 94 A.2d 724 (1953); *Sheffield Water Co. v. Elk T. Co.,* 225 Pa. 614, 74 A. 742 (1909). "This rule applies with special force to a reservation or exception which amounts to a cutting down of the grant ..." *Heidt,* 176 A.2d at 402, (citation omitted).

■ In this case, we find that the exception did not establish that Penelec owned all the land below the 1105 foot elevation. Contrary to Penelec's assertion, the evidence was not undisputed that Waltman's predecessor in title excepted all land lying below the 1105 foot elevation. Waltman's expert, Mr. Fox, even though conceding that he did not run his survey with the exception, stated that he ran his survey using the course and distance calls in the unambiguous deed. By so doing, he was able to establish that Waltman's structures were not on Penelec property. Thus, this exception was doubtful and must be construed in favor of Waltman. *Heidt, supra.* Moreover, Federal Energy Regulatory Commission proceedings for the original Piney Dam Project showed that the dam was to be established at an elevation of 1085 feet. Accordingly, we find appellant's argument meritless.

■ Penelec next contends that if the deed to its predecessor in title is not ambiguous, the lower court erred as a matter of law in disregarding the prevailing natural monuments and adjoining calls in determining the boundary line of Penelec's property.

We stated, in *Baker v. Roslyn Swim Club,* 206 Pa.Super. 192, 213 A.2d 145 (1965):

The general rules to be applied in boundary cases were set forth in *Walleigh v. Emery,* 193 Pa.Super. 53, 58, 163 A.2d 665, as follows: "Courses and distances in a deed must give way to monuments on the ground. *Merlino v. Eannotti,* 177 Pa.Super. 307, 110 A.2d 783.

"Parol evidence is admissible to establish the existence of monuments. *New York State Natural Gas Corp. v. Roeder,* 384 Pa. 198, 120 A.2d 170. Boundaries may be established by circumstantial as well as direct evidence. *Hostetter v.*

*Commonwealth,* 367 Pa. 603, 80 A.2d 719; *Guerra v. Galatic,* 185 Pa.Super. 385, 137 A.2d 866."

.     .     .     .     .

The general rule for establishing the order of precedence between inconsistent calls in a deed is found in 12 Am. Jur.2d Boundaries § 65, at page 603, as follows: "Where the calls for the location of boundaries to land are inconsistent, *other things being equal,* resort is to be had first to natural objects or landmarks, next to artificial monuments, then to adjacent boundaries (which are considered a sort of monument), and thereafter to courses and distances." However, the same paragraph continues with the following language: "Where, however, it is apparent that a mistake exists with respect to the calls, an inferior means of location may control a higher one. In the last analysis the call adopted as the controlling one should be that most consistent with the apparent intent of the grantor."

.     .     .     .     .

Likewise, the same general rule and the same exceptions are cited in 11 C.J.S. Boundaries § 51, as follows: "The rule that artificial monuments control courses and distances in case of conflict is not an imperative and exclusive one, but is a rule of construction to ascertain, or to aid in determining, the intention of the parties; and it is not followed where strict adherence to the call for a monument would lead to a construction plainly inconsistent with such intention.

"Accordingly, courses and distances will prevail over monuments where absurd consequences might ensue by giving controlling influence to a call for the latter, or where, in any given case, a consideration of all the facts and circumstances shows a call for distance to be the more reliable or certain, or where the call for the monument was inserted by mistake or inadvertence."

*Baker,* 213 A.2d at 148–149.

Here, Penelec contends that a stream, which is a natural monument, existed at the 1105 foot elevation. A stream did exist, but according to Mr. McGarvey's survey the stream was

not at the 1105 foot elevation as Penelec contends. Mr. McGarvey ran the course and distance calls in the County Realty deed and the stream coincided with these calls. However, Mr. McGarvey found that the stream was not at the 1105 foot elevation but instead at a lower elevation. Thus, he concluded that Waltman's structures were not on Penelec's property. Contrary to Penelec's contentions, the monument was not ignored but was taken into account by Mr. McGarvey when he established the calls in the deed. Because there was doubt as to the placement of the stream, Waltman's experts, using the courses and distances in the County Realty deed, established the proper boundaries of Penelec's and Waltman's property. As the court in *Baker* stated, courses and distances will prevail over monuments when there is doubt as to the monument. *Baker*, 213 A.2d at 150. Accordingly, Penelec's argument must fail. *See, Baker, supra* (holding that a stone monument mentioned in three deeds did not prevail over courses and distances in the deeds because the monument was not free from doubt and could lead to an absurd result); *Yoho v. Stack*, 373 Pa.Super. 77, 540 A.2d 307 (1988) (holding that monument must yield to deed description where expert testimony pertaining to the deed description was more credible and that courses and distances will prevail over monuments where the monuments are doubtful); *Howarth v. Miller*, 382 Pa. 419, 115 A.2d 222 (1955).

Penelec's final contention is that the lower court erred as a matter of law in failing to find that Penelec owned the disputed property by de facto taking. We disagree.

The requirements of a de facto taking can be summarized as follows:

A de facto taking occurs when an entity, clothed with the power of eminent domain, exercises that power causing damages to the property owner which are the immediate, necessary and unavoidable consequences of that exercise. *Harborcreek Township v. Ring*, 48 Pa.Commonwealth Ct. 542, 410 A.2d 917 (1980). To find a de facto taking, there must be exceptional circumstances which have substantially

deprived the property owner of the use and enjoyment of his or her property. *Jacobs Appeal,* 55 Pa.Commonwealth Ct. 142, 423 A.2d 442 (1980), *appeal dismissed,* 499 Pa. 337, 453 A.2d 336 (1982). Hence, in determining whether a de facto taking occurred, each case must be examined on its own factual situation. *McGaffic v. Redevelopment Authority of City of New Castle,* 120 Pa.Commonwealth Ct. 199, 548 A.2d 653 (1988), *appeal denied,* 523 Pa. 644, 645, 565 A.2d 1168, 1169 (1989).

*Appeal of D.R.E. Land Developing, Inc.,* 149 Pa.Cmwlth. 290, 294, 613 A.2d 96, 98 (1992).

Here, Penelec contends that a de facto taking resulted because it had marked off the property with wires. This fact was disputed at trial by Waltman, and there was only evidence of one small piece of wire through a tree. In fact, Penelec presented no evidence of a de facto taking at trial. This contention was raised for the first time in its Closing Argument/Trial Brief/Proposed Findings of Fact. Penelec in making this argument is basically conceding that it did not obtain the property legitimately by deed. Such an argument, would support Waltman's view that he is the legitimate owner of the disputed property.[7] Accordingly, Penelec's final allegation of error fails.

Judgment affirmed.

---

7. Penelec relies on the case of *Fulmer v. White Oak Borough,* 146 Pa.Cmwlth. 473, 606 A.2d 589 (1992), to support its contention that there was a de facto taking. In *Fulmer* there was a clear taking of land by White Oak Borough. *Id.* at 592. Moreover, the main issues addressed in *Fulmer* were whether the Fulmer's action was properly brought as an action in trespass or whether it should have been brought under the Eminent Domain Code and what a proper remedy would be. *Id.* at 590. Obviously, *Fulmer* is inapposite to this case. There was not a clear taking of property by Penelec. Furthermore, Penelec is trying to shift the burden to Waltman by claiming there was a de facto taking.